# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Akash PAUL,

     **Plaintiff,**

    **v.**

John TSOUKARIS, Field Office Director,
DHS/ICE, and Jeh JOHNSON, Secretary
of Homeland Security,

     **Defendants.**

Civ. No. 13-5891 (KM) (JBC)

**OPINION**

### KEVIN MCNULTY, U.S.D.J.:

The *pro se* plaintiff, Akash C. Paul ("Paul"), a former employee of U.S. Immigration and Customs Enforcement ("ICE"), commenced this action on October 3, 2013. On January 7, 2015, Paul filed an Amended Complaint (referred to herein as the "Complaint" and cited as "AC")[1] alleging that the Department of Homeland Security and ICE (collectively, "DHS") discriminated against him based on his national origin as to wages, and discriminated against him based on his disability by monitoring or stalking him at work. Paul alleges that, in doing so, DHS violated his rights under (1) Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; (2) the Equal Pay Act

---

[1]    Citations to the record will be abbreviated as follows:

    "AC" = Amended Complaint (ECF no. 38)

    "Def. Facts" = Defendants' Statement of Material Facts (ECF no. 68-2)

    "Def. Mot." = Brief in Support of Defendants' Motion for Summary Judgment and Dismissal of the Amended Complaint (ECF no. 68-1)

    "Pl. Opp." =  Plaintiff's Objection on Defendants' Motion for Summary Judgment and Dismissal of the Amended Complaint (ECF no. 73)

    "Def. Reply" = Defendants' Reply Brief (ECF no. 74)

    "Paul Dep." = Deposition of Akash Paul (ECF no. 68-5)

of 1963 ("EPA"), 29 U.S.C. § 206(d); (3) Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*; (4) the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*; and (5) the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.*[2]

Now before the Court is Defendants' motion for summary judgment. (ECF no. 68) For the reasons set forth herein, Defendants' motion is granted as to all counts.

## I.     Background

### A. Relevant Facts[3]

---

[2]     Paul does not clearly separate his allegations into counts, but he does state at the start that two "Issues Need to be Resolved": (1) "Plaintiff and another employee were hired by DHS / ICE as Detention and Removal Assistant as the GS-05 and GS-07 grade level [respectively]." (2) "On or around November 07, 2011 – November 28, 2011, Plaintiff's immediate supervisor unduly watched or monitored or stalked the plaintiff. (While plaintiff was on disability) and sent emails to another recipient[] about the alleged actions." (AC 1) The alleged Title VII and Equal Pay Act violations clearly pertain to the first issue, whereas the alleged Americans with Disabilities Act and Rehabilitation Act violations pertain to the second.

[3]     DHS submitted a Statement of Material Facts, to which Paul has not responded. DHS asks that the Court consider the facts in its statement admitted for the purpose of summary judgment, in accordance with Local Civil Rule 56.1(a) which states:

> The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.

*Id.* A failure to dispute a party's statement of material facts, however, "is not alone a sufficient basis for the entry of a summary judgment." *See Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990) (holding that even where a local rule deeming unopposed motions to be conceded, the court was still required to analyze the movant's summary judgment motion under the standard prescribed by Fed. R. Civ. P. 56(e)); *see also Muskett v. Certegy Check Servs., Inc.*, Civ. No. 08-3975, 2010 WL 2710555 (D.N.J. July 6, 2010) ("In order to grant Defendant's unopposed motion for summary judgment, where, as here, 'the moving party does not have the burden of proof on the relevant issues, . . . the [Court] must determine that the deficiencies in [Plaintiff's] evidence designated in or in connection with the motion entitle the [Defendants] to judgment as a matter of law.'" (quoting *Anchorage Assocs.*,

The plaintiff, Akash Paul, was born outside of the United States (in India, as it happens). He speaks English, but he states that his English-language skills are imperfect. Before starting work at DHS, Paul had completed a Master's Degree and had been employed as a Sheriff Processing Associate in Lawrenceville, Georgia, where he "showed exemplary service." (AC ¶ 3)

On April 8, 2008, ICE's Newark Field Office posted an employment vacancy announcement (identification numbers 184127 and 181298) seeking to hire Detention and Removal Assistants ("DRAs"). (Def. Facts ¶ 1) Around May 2, 2008, Paul applied for a vacant DRA position, and underwent screening conducted by the California-based Laguna Service Center ("LSC"). (*Id.* ¶¶ 2–3; AC ¶ 3, Ex. 5–6)[4] LSC also determined pay grade ranges for prospective employees. (Def. Facts ¶ 4) After compiling a list of qualified candidates, LSC reported the results to Supervisory Mission Support Specialist Noel Elia, who served as a liaison between the Newark Field Office Director and LSC. (*Id.* ¶¶ 6–7) Elia then forwarded the list and supporting documentation to Newark Field Office Director Scott Weber, the official with ultimate authority to make "hiring decisions and pay grade selections from the range provided by the LSC, based on the applicant's qualifications." (*Id.* ¶¶ 8–10) A panel of ICE supervisors interviewed the prescreened applicants, including Paul, and "determined which applicants to refer to Weber for a final hiring decision." (*Id.* ¶¶ 11, 14–16)

In May 2008, Weber selected Paul and seven other applicants for the DRA position. (*Id.* ¶ 17) On May 27, 2008, Elia provided to LSC Human Resource Specialist Leah Tougas a list of the eight applicants selected for hiring

---

922 F.2d at 175)). I have reviewed Paul's Complaint, attached exhibits, and briefing with an eye to assertions of fact that may be supported by the record.

4       Attached to Paul's Amended Complaint are documents, not separately designated as exhibits but continuously page-numbered. Herein, "AC Ex. p. ___" identifies the page number within the collected attachments. Paul has also included these same attachments with his opposition brief, paginated in the same manner, marked overall as Exhibit P1.

and the pay grades, or GS levels,[5] that Weber had assigned each applicant. (*Id.* ¶ 19) In the e-mailed list, Paul was selected for the DRA position at the GS-7 level.[6] (*See id.* ¶ 20) Within minutes, Tougas replied that "all of these selections are good." (*Id.* ¶ 21)

However, Tougas followed up two days later, acknowledging that she had "reviewed these applications too quickly." It had occurred to her, she wrote, that changes would need to be made to some applicants' pay grades in order to permit the hiring of E.G.,[7] an intern at the Newark Field Office:

> [E.G.] is only qualified for a GS-5 so he will be offered an appointment at the GS-5 but he is at the bottom of the list, he is reachable, but changes would have to be made in the grade that other applicants were selected at:
>
> GS-5 selections:
>
> [A.Z.]
>
> [M.N.]

---

[5]    "The General Schedule (GS) classification and pay system covers the majority of civilian white-collar Federal employees (about 1.5 million worldwide) in professional, technical, administrative, and clerical positions." https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/.

[6]    The email provided:

The following are the DRA selections for the Newark Field Office under Vacancy Id#'s 184127 & 181298:

* * *

Asylum Clerk [F.M.] currently employed with DHS/CIS is selected

for DRA, GS-6, FNE-DR0-2008-0129

[M.N.] is selected for DRA, GS-6, FNE-DRO-2008-0116

[B.R.] is selected for DRA, GS-6, FNE-DRO-2008-0174

[Y.P.] is selected for DRA, GS-6, FNE-DRO-2008-0164

Akash Paul is selected for DRA, GS-7, FNE-DRO-2008-0128

[T.D.] is selected for DRA, GS-7, FNE-DRO-2008-0115

[A.Z.] is selected for DRA, GS-5, FNE-DRO-2008-0173.

(Def. Facts ¶ 20)

[7]    DHS has used initials to protect individuals' privacy in conjunction with sensitive information such as their salaries. I do so as well.

4

>Paul Akash
>
>[T.D.]
>
>[E.G.]
>
>The rest of the selections would remain the same.
>
>Please let me know if you would like me to make these changes on your certificates in order to reach [E.G.]

(Def. Facts ¶ 22, 25) Weber then lowered the pay grades for Paul, M.N., and T.D. to GS-5. (*Id.* ¶ 23–24)

Paul accepted the DRA position at the GS-5 level and began employment with DHS on August 18, 2008.[8] (*Id.* ¶ 27; *see also* AC ¶¶ 1, 3)

On March 10, 2009, Paul sent an email to Elia requesting a reconsideration of his salary grade level. (Def. Facts ¶ 30; AC ¶ 3, Ex. pp. 9–10) That same day, Elia replied that the grade reconsideration request would have to come from Paul's supervisor in order for the Human Resources department to consider it. (AC Ex. p. 8) Paul contacted Human Resources Specialist Sandra Crellin, who referred Paul back to Elia, "because the selections and the grades come directly from the Field Office." (*Id.*)

On April 1, 2009, Paul was injured at work when a coworker startled him from behind with an air duster, causing Paul to hit his right elbow on a table and twist his neck.[9] (AC ¶ 4) While out on disability for these injuries, Paul received a promotion on August 18, 2009, to GS-6, and again on August 18, 2010, to GS-7. (Def. Facts ¶¶ 31–33) Paul has stated that he graduated to GS-8 on August 18, 2011. (AC Ex. p. 43)

On November 5, 2010, Paul filed a complaint (dated October 29, 2010), with then-Acting Field Office Director John Tsoukaris. (Def. Facts ¶ 34; AC Ex. pp. 1–3) The bulk of that complaint related to Paul's work-related injury and issues concerning his return to work from disability leave. However, Paul also

---

[8]    The Complaint says "2009," but that appears to be a typographical error. (*See* AC ¶¶ 3, 4)

[9]    Given the date, this may have been an ill-considered April Fools' joke.

complained that another employee was hired as a DRA in the same unit as Paul, but at a GS-7 salary level, because of her "prior experience as a contractor employee in the same building."[10] Paul noted that this employee's "close relative is a supervisor in the same building with DHS/ICE." Paul explained that he reasonably expected to be hired at GS-7 because of his prior government experience (in Gwinnett County, Georgia) and his advanced degrees. Because "neither the hiring panel nor Newark field office acknowledged about my education or skills even [after] I requested for a grade re consideration and the same time another employee hired as grade 07 directly. I strongly believe that I was discriminated by the department." (AC Ex. p. 3)

On November 7, 2011, Paul "filed a second claim for [workers' compensation] benefits based upon injuries he allegedly sustained" in the April 1, 2009 incident. (Def. Facts ¶ 48) That same day, Paul began a third and final attempt to return to work after receiving medical clearance to do so, albeit with restrictions. (*See* AC ¶ 3) Those restrictions were submitted to Mission Support Specialist Belinda Davis on a CA17 form. (*Id.*) Then, on November 28, 2011, Supervisory Detention Deportation Officer ("SDDO") Raquel Martinez[11] directed Paul to photocopy an "A-file." (*Id.*) Paul asked to be exempted from photocopying the entire file because of the exertion required to repetitively pull down and lift the copy machine's lid. (*Id.*) Martinez brought a chair to the copy room for Paul to use, but nevertheless required Paul to photocopy the entire file. (*Id.*) That task allegedly aggravated Paul's injuries, and he was admitted to St. Trinitas Hospital in Newark, NJ, where the attending physician ordered Paul to stay home from work. (*Id.*)

---

[10]    In the letter, Paul dates his awareness to around August 3, 2010. However, in his opposition brief, he notes that the correct date is August 3, 2009. (*See* Pl. Opp. 11)

[11]    Raquel's last name is now Burnett. (Def. Facts ¶ 49 n.4) I will refer to her as Martinez, her name at the time of the events described.

On December 5, 2011, Paul completed his CA2a Notice of Recurrence and submitted it to Davis. (AC ¶ 4) That same day, Davis asked Martinez in an email whether Martinez had "ma[de] any accommodations or adjustments in [Paul]'s regular duties due to injury-related limitation." That information was needed to process a duty status report in support of Paul's application for workers' compensation benefits.[12] (Def. Facts ¶¶ 49, 51; AC Ex. pp. 20 –21) In reply, Martinez summarized the work Paul was assigned and completed during the three weeks between November 7 and November 28, and included a three-sentence summary of the November 28 photocopying assignment.[13] (Def. Facts

---

[12]    Item 38 on the Office of Workers' Compensation Programs' "Notice of Recurrence" CA-2a form requires the employing agency to answer the question: "After the original injury, did you make any accommodations or adjustments in the employee's regular duties due to injury-related limitations? . . . If so, provide full details." (AC Ex. p. 12)

[13]    The body of the email reads:

Good afternoon Belinda,

Please see response below:

ERA Paul returned to duty 11/7/11. He was assigned minimal duties during his first week (11/7/11 – 11/11/11) since he needed computer access to be restored and multiple database passwords to be reset. He submitted helpdesk tickets and completed 2 one-page application forms.

During ERA Paul's second week on duty (11/14/11 – 11/18/11) he was tasked with completing all the mandatory virtual university courses and preparing travel document presentation for about 2-4 files which he completed successfully.

The week of 11/23/11, ERA Paul was assigned 2 primary detained case management dockets for completing travel document presentations and other clerical actions such as photo copies. He completed about 3-5 files successfully during this week.

On 11/28/11, ERA was assigned a task to make a photo-copy of one file and 2 copies of the travel document presentation. He was provided a chair by the copy machine and advised to take as many breaks as he needed. ERA Paul completed the photo copy of the file but was not able to photo copy the 2 travel document presentations.

All reasonable accommodations were made to accommodate ERA Paul based on his limitations. He was provided with several breaks daily at his discretion which he took to walk around the office or lay down in his car

7

¶ 52; AC Ex. pp. 20–21) Martinez's report "had no effect on Paul's wages or compensation," and "[f]ollowing Martinez's December 5, 2011 e-mail to Davis, Paul's application for benefits was granted." (Def. Facts ¶¶ 53–54)

On January 12, 2012, Paul received a package from Davis regarding his workers' compensation claim. The package included Martinez's December 5, 2011 e-mail to Davis. (Def. Facts ¶ 55) Reviewing the documents, Paul "was shocked to learn the content of the emails" sent by Martinez to Davis. (AC ¶ 5) Paul took this to "affirm[] that [he] was unduly watched or monitored or stalked even at [his] break time by [his] immediate supervisor SDDO Martinez." (AC ¶ 6) Around this same time, Paul conducted "further research" regarding his claim of wage discrimination, and learned that the employee hired as a DRA at the GS-7 level was named J.R. (AC ¶¶ 3, 7)

In a letter dated January 20, 2012, Paul complained to Tsoukaris that Martinez's email was discriminatory. (Def. Facts ¶ 56) On February 8, 2012, Tsoukaris "informed Paul that he could contact the ICE Office of EEO within 45 days of the most recent alleged discriminatory act." (*Id.* ¶ 59)

In a February 10, 2012 letter, Paul wrote to the Equal Employment Opportunity Commission ("EEOC") asserting two grievances. First, Paul stated that the DHS's lack of consideration of his academic qualifications and work experience when establishing his initial salary grade of GS-5, while hiring J.R. at the GS-7 level, "forced [Paul] to believe reasonably that [he] was discriminated [against]." (AC Ex. pp. 26–27) Second, Paul asserted that he was discriminated against and harassed by Martinez because her December 5, 2011 email "details that [he was cleared for work on November 5, 2011], what I am doing, what kind of job I did, how I utilized on my lunch hour etc. seems so unfortunate. I reasonably believe that my employer is stalking . . . me and it is scary too." (*Id.* Ex. 27)

---

to rest. All of the files assigned to ERA Paul were below the weight limitation of 10 pounds.

(AC Ex. p. 20)

On March 30, 2012, Paul initiated contact with an ICE EEO Counselor to complain of discrimination. (Def. Facts ¶ 72) Paul received notice of his right to file a formal EEO complaint on June 28, 2012. He did file a formal complaint with the EEOC on July 9, 2012, alleging "severe discrimination from [his] employer based on [his] National Origin and [his] Physical Disability." (*Id.* ¶¶ 75–76)

On February 4, 2013, DHS's Office for Civil Rights and Civil Liberties issued a procedural dismissal of Paul's case. (Def. Facts ¶ 79; AC Ex. pp. 69-71) DHS found that Paul "failed to timely initiate EEO Counselor contact" within 45 days of the alleged discriminatory act. (Def. Facts ¶ 79; AC Ex. p. 70) Paul had first "contacted the EEO Counselor on March 30, 2012, nearly four years after the August 18, 2009 date of the alleged act of [wage] discrimination . . . , and more than four months after the alleged act of [disability] discrimination." (AC Ex. p. 70) DHS considered but found unpersuasive Paul's "explanation that he delayed contacting an EEO Counselor because [he] did not understand how to file a complaint [and] that he was unaware of the timeline for doing such." *Id.* To the contrary, DHS found, "training records show that . . . on October 18, 2008, [Paul] completed an EEO course entitled 'EEO Complaints Process Training for Employees' and further, that as recent as 2011, [Paul] took and completed additional EEO-related courses." (*Id.*) DHS also rejected Paul's explanation that he became aware of the first discriminatory act only on August 3, 2010, and the second only on February 11, 2012.[14] (*Id.*)

---

[14]    DHS notes:

> Using the August 3, 2010 date for Claim 1, Complainant's March 30, 2012 EEO Counselor contact was approximately one and a half years after his August 3, 2010 realization. Using the February 11, 2012 date for Claim 2, Complainant's March 30, 2012 EEO contact was three days after the March 27, 2013 deadline date.

(AC Ex. p. 70 n.2)

9

On March 18, 2013, Paul served a notice of appeal with the EEOC. (Def. Facts ¶ 82) The EEOC failed to reach a decision on his appeal within 180 days (AC ¶ 2), and Paul commenced this action in federal court on October 3, 2013. On January 7, 2015, Paul filed the Amended Complaint that is the subject of the motion for summary judgment now before this Court.

## II.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*,

10

912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

Where, as here, the nonmoving party is appearing pro se, "the court has an obligation to construe the complaint liberally." *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009) (citing *Haines v. Kerner*, 404 U.S. 519, 520–521, 92 S. Ct. 594 (1972); *Gibbs v. Roman*, 116 F.3d 83, 86 n.6 (3d Cir. 1997)). I have construed Paul's Complaint, and all of his pleadings and filings, in that liberal spirit.

### III.   Discussion and Analysis
#### A. Title VII: Wage Discrimination
##### 1.   Administrative Exhaustion Requirement

"'It is a basic tenet of administrative law that a plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief.'" *Slingland v. Donahoe*, 542 F. App'x 189, 191 (3d Cir. 2013)[15] (quoting *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir. 1997)). "In particular, '[t]he Supreme Court has explained that when Title VII remedies are available, they must be exhausted before a plaintiff may file suit.'" *Id.* (quoting *Spence v. Straw*, 54 F.3d 196, 200 (3d Cir. 1995)). The Third Circuit has "explained that the purposes of the exhaustion requirement are to promote administrative efficiency, 'respect[ ]

---

[15]    All Court of Appeals cases cited to F. App'x are non-precedential. *See* 3d Cir. IOP 5.3; Fed. R. App. P. 32.1(a).

executive autonomy by allowing an agency the opportunity to correct its own errors,' provide courts with the benefit of an agency's expertise, and serve judicial economy by having the administrative agency compile the factual record." *Robinson*, 107 F.3d at 1020 (quoting *Heywood v. Cruzan Motors, Inc.*, 792 F.2d 367, 370 (3d Cir. 1986)).

"Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16, establishes the virtually exclusive remedy for federal employees who allege discrimination in the workplace."[16] *Green v. Potter*, 687 F. Supp. 2d 502, 513 (D.N.J. 2009) (Simandle, C.J.), *aff'd sub nom. Green v. Postmaster Gen. of U.S.*, 437 F. App'x 174 (3d Cir. 2011). Exhaustion under Title VII "requires both consultation with an agency counselor and filing a formal EEOC complaint within the required times." *Robinson*, 107 F.3d at 1021. The federal regulations governing federal sector equal employment opportunity require that "the employee contact an EEOC counselor within 45 days of the alleged discriminatory conduct."[17] *Pagan v. Holder*, 741 F. Supp. 2d 687, 693 (D.N.J. 2010), *aff'd sub nom. Pagan v. Gonzalez*, 430 F. App'x 170 (3d Cir. 2011) (citing

---

[16]     The major exception is the Age Discrimination in Employment Act ("ADEA"). ADEA applies narrowly to discrimination in the workplace based on age, but does not require exhaustion of administrative remedies. *See Green*, 687 F. Supp. 2d at 513 n.6. No ADEA claim is alleged in this action.

[17]     An "[a]ggrieved person[] who believes [he] ha[s] been discriminated against on the basis of . . . national origin [or] disability . . . must consult a[n] [EEO] Counselor prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a). Further,

> (1) An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.

> (2) The agency or the Commission shall extend the 45–day time limit in paragraph (a)(1) of this section when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

*Id.*

12

29 C.F.R. § 1614.105(a)(1)).

Thus, in the ordinary case covered by § 1614.105(a)(1), an aggrieved federal employee who fails to contact an EEOC counselor has not exhausted his administrative remedies and is barred from seeking judicial review. Where, as here, the employee has contacted an EEOC counselor, a claim based on any allegedly discriminatory act within the preceding 45 days is considered timely. *See Winder v. Postmaster Gen. of U.S.*, 528 F. App'x 253, 255 (3d Cir. 2013) ("This 45-day time limit operates akin to a statute of limitations: a claim brought more than 45 days after the date it accrued will be barred.") (citing *Williams v. Runyon,* 130 F.3d 568, 573 (3d Cir. 1997)); *see also Pagan,* 741 F. Supp. 2d at 694 (granting summary judgment to defendant, *inter alia,* because plaintiff did not consult an EEOC counselor within 45 days after the alleged racist statement was made); *Green,* 687 F. Supp. 2d at 513–15 (plaintiff's contact with an EEO counselor "was beyond the forty-five day period allowed for contact after the alleged discriminatory actions took place and thus was untimely"). I will call this 45-day period preceding consultation with an EEOC counselor the "administrative statute of limitations."

DHS argues that Paul was aware of the alleged pay discrimination by August 3, 2010, at the latest,[18] when he "heard shocking news about hiring another employee with higher grade." (Def. Mot. 20) (quoting Paul's Oct. 29, 2010 letter) Thus, say defendants, the 45-day limitations period began to run on that date, requiring Paul to contact the EEO by September 17, 2010. If that is the deadline, then clearly Paul failed to meet it, because he did not contact an EEO Counselor until around March 30, 2012. According to defendants, Paul therefore did not timely exhaust his administrative remedies, and his discrimination claim should be barred.

---

[18]    DHS notes that in his opposition brief, Paul asserts that the correct date on which he learned this information was August 3, 2009, a year earlier. (Def. Reply 2) (citing Pl. Opp. 11 ) If so, then DHS's untimeliness argument would apply *a fortiori.*

DHS's argument may have been correct at one time, but it is no longer. In 2009, the Lilly Ledbetter Fair Pay Act ("FPA") amended Title VII to include the following section:

> [A]n unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, . . . when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

42 U.S.C. § 2000e–5(e)(3)(A). "Thus, pursuant to the FPA, each paycheck that stems from a discriminatory compensation decision or pay structure is a tainted, independent employment-action that commences the administrative statute of limitations." *Noel v. The Boeing Co.*, 622 F.3d 266, 271 (3d Cir. 2010).

Paul says that, on a discriminatory basis, he was paid less than J.R. for the same DRA position, even though he was more qualified and experienced. The question is whether that claim of wage discrimination falls within the administrative statute of limitations—*i.e.,* within the 45-day period preceding his first consultation with the EEOC counselor on March 30, 2012 (and continuing thereafter, presumably).

Now it is true that Paul, although hired at a GS-5 level, was promoted to GS-7 on August 18, 2010 (and to GS-8 on August 18, 2011). It would be possible, then, to argue that any wage discrimination vis-à-vis J.R. had been remedied long before the administrative statute of limitations period. But reading this pro se plaintiff's submissions liberally, I think Paul is saying that if he had been hired at a higher GS level, his salary would have escalated from that higher level. Thus the alleged discrimination at the time of hiring continued to affect his salary through March 30, 2012 (when he contacted the EEOC Counselor) and beyond.[19] Paul may not be entitled to claim damages

---

[19]   In a June 14, 2012 letter to Contract EEO Counselor Rita Fowler, Paul wrote in response to Fowler's question asking him to identify the remedy he is seeking in his EEO complaint:

based on paychecks dating from before the 45-day period preceding that EEOC consultation. It does not follow, however, that his cause of action is barred.

I therefore conclude that DHS has not met its threshold burden to show an absence of evidence that Paul was paid wages, benefits, or other compensation affected at least in part by the allegedly discriminatory salary decision, within 45 days before Paul's initial contact with an EEO Counselor. *See Celotex*, 477 U.S. at 325. Therefore, I cannot conclude that Paul's initial contact with an EEO Counselor was untimely, and I consequently cannot find that, as to his wage discrimination claim, Paul failed to exhaust his administrative remedies or missed the administrative statute of limitations. However, Paul's wage discrimination claim fails for other reasons, to which I now turn.

### 2.    Standard of proof – *McDonnell Douglas*

Summary judgment on Title VII claims is governed by a specialized burden-shifting regime set out in the Supreme Court's decision in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *McDonnell Douglas* divides the burden of production into three steps, shifting the burden between the plaintiff and the defendant.

**Step 1: The Prima Facie Case.**

At the outset, the plaintiff must state a prima facie claim of discrimination. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). A prima facie case of racial discrimination encompasses four elements: (1) the

---

I was hired as grade 5 in August 18, 2008, with a salary of $33,187.00, in 2009 August 18, I was promoted to grade 6 and salary was $38,548.00, in 2010 August 18, I was promoted to grade 7 and salary was $43,738 and in 2011 August 18, I was promoted to grade 8 and salary was $48,439.00. I do not know the grade differential on these periods.

(AC Ex. p. 43) Although mentioned only in an exhibit to the Complaint, I charitably interpret Paul's reference to grade differentials to refer to a continuing disparity between what his compensation was and what it would have been had he not been subject to the initial, allegedly discriminatory grade assignment of GS-5.

plaintiff belonged to a protected class; (2) he[20] was qualified for the position in question; (3) he was subject to an adverse employment action; and (4) the adverse action was taken under circumstances giving rise to an inference of discrimination. *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014) (citing *Burton*, 707 F.3d at 426); *accord Shahin v. Delaware*, 543 F. App'x 132, 136 (3d Cir. 2013); *Rodriguez v. Nat'l R.R. Passenger Corp.*, 532 F. App'x 152, 153 (3d Cir. 2013).

### Step 2: Legitimate non-discriminatory reason for the action.

If the plaintiff states a *prima facie* case, the burden of production shifts to the defendant, which must articulate a legitimate basis for the adverse employment action. *Burton*, 707 F.3d at 426; *Rodriguez v. Nat'l R.R. Passenger Corp.*, 532 F. App'x at 153. "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton*, 707 F.3d at 426 (internal quotations omitted). Indeed, at this stage, "the defendant need not prove that the articulated reason actually motivated its conduct." *Burton*, 707 F.3d at 426 (internal quotations omitted).

### Step 3: Pretext.

Once the defendant has offered a non-discriminatory reason, the burden of production shifts back to the plaintiff. Now the plaintiff must present evidence to show that the defendant's stated reason is merely a pretext for discrimination. *Burton*, 707 F.3d at 426. The plaintiff can do that in either of two ways: (1) he can discredit defendant's proffered reason; or (2) he can offer evidence that discrimination was more likely than not a motivating or determinative factor in the adverse action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). To meet that burden, the plaintiff may rely on direct or circumstantial evidence. *Id.*

---

[20]     Because the plaintiff here happens to be male, I will use the male pronoun even when referring to a generic plaintiff.

If the plaintiff relies on the first method (discrediting the defendant's proffered reasons), he faces a demanding standard: he must present evidence that allows a factfinder "reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764 (internal quotations and citations omitted). The plaintiff "must show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Iadimarco v. Runyon*, 190 F.3d 151, 166 (3d Cir. 1999).

If the plaintiff relies on the second method (evidence that discrimination was a motivating factor), he can provide the required evidence in at least three ways: "by showing that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons." *Fuentes*, 32 F.3d at 765.

### 3.   *McDonnell Douglas* standard applied to the evidence

Paul has presented limited circumstantial evidence in support of his claim that DHS discriminated against him. I do not believe his evidence met his step one burden of establishing a prima facie case. Giving the benefit of the doubt, however, I also consider it in connection with step three. I consider each piece of evidence individually, and I also consider the overall picture that it paints. Nevertheless, Paul's evidence fails to rebut DHS's evidence of its nondiscriminatory reasons for setting his starting salary at the GS-5 level.

17

### a. Paul's Prima Facie Case

The record evidence supports the first three elements of Paul's prima facie case for wage discrimination: (1) Paul belongs to a protected class based on his non-U.S. national origin (India); (2) Newark Field Office Director Scott Weber initially selected GS-7 as Paul's starting pay grade, raising an inference that he was qualified for that pay grade upon starting the DRA position (*see* Def. Facts ¶¶ 20, 24); and (3) Paul was subject to an adverse employment action when he was ultimately hired at a lower GS-5 level (and continued to receive a correspondingly lower salary as his pay grade was escalated from that depressed level). (*See* Def. Facts ¶ 24)

Paul's prima facie case falters, however, at the fourth element: that the adverse action was taken under circumstances giving rise to an inference of discrimination. "A plaintiff's subjective belief that [national origin] played a role in an employment decision is not sufficient to establish an inference of discrimination." *Rodriguez v. Nat'l R.R. Passenger Corp.*, 532 F. App'x 152, 153 (3d Cir. 2013) (discussing discrimination based on race) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999)). "However, discrimination may be inferred by showing that the employer treated a similarly situated employee outside of the plaintiff's class more favorably." *Id.* The comparison, however, must be apt and clear. "[T]o be considered similarly situated, comparator employees must be similarly situated in all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881–82 (3d Cir. 2011) (citing *Russell v. University of Toledo,* 537 F.3d 596 (6th Cir. 2008); *Lee v. Kansas City S. Ry. Co.,* 574 F.3d 253, 259–261 (5th Cir. 2009)).

Paul argues that he and J.R. were similarly situated in all relevant respects—they were hired for the same DRA position in the same Field Office. (AC ¶ 8; *id.* Ex. p. 3) If anything, says Paul, he was more qualified than J.R., given his master's degree and 2½ years of experience working for Gwinnett County, GA, in contrast to J.R.'s one year of government experience. (*Id.*) DHS replies that Paul and J.R. were not similarly situated, because they applied

18

under different vacancy announcements and J.R. was hired a year before Paul was. (Def. Mot. 24; *see also* Def. Facts ¶ 36)

I do not find the different vacancy announcements and the one-year difference in hiring date to be dispositive in themselves. DHS may be able to explain why these details affect either the nature of the job or the criteria employed in assigning a GS grade, but it has not done so here. If that were DHS's only argument, I might find that Paul had established a prima facie case of national origin discrimination. But DHS has more.

DHS submits evidence that comparators other than J.R. were treated the same as Paul. One outlier, says DHS, does not establish a prima facie case. Courts have been hospitable to that approach. One has noted that "isolated incidents or random comparisons demonstrating disparities in treatment may be insufficient to draw a prima facie inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of employees." *Houck v. Polytechnic Inst. & State Univ.,* 10 F.3d 204, 206–07 (4th Cir. 1993); *see also Hein v. Oregon Coll. of Educ.,* 718 F.2d 910, 916 (9th Cir. 1983) (cautioning that "a comparison to a specifically chosen employee should be scrutinized closely to determine its usefulness" where plaintiffs chose one of 13 employees for comparison "apparently because he was the highest paid employee performing substantially equal work, not because he was the only comparable employee") (citing *Heymann v. Tetra Plastics Corp.,* 640 F.2d 115, 122 (8th Cir. 1981)); *Woodward v. United Parcel Serv., Inc.,* 306 F. Supp. 2d 567, 575 (D.S.C. 2004) ("In cases where there are multiple comparators, identification of only a single comparator not in the protected class paid more than the plaintiff may not be sufficient to establish a prima facie case.").

DHS identifies three other applicants also "selected for employment as DRAs in May 2008 by the same selecting official, Weber, under the same job announcement" as Paul: (1) M.N., a Black or African-American male; (2) T.D., a female whose race/national origin is unknown; and (3) A.Z., a Caucasian male.

(Def. Mot. 24; *see also* Def. Facts ¶¶ 20, 26) M.N. and T.D. "also qualified for a pay grade higher than the GS 5 level" but "received the same treatment as Paul when Weber reduced their pay grades to the GS 5 level."[21] (*Id.*) Paul cannot establish a prima facie case of discrimination, says DHS, because he "was treated the same as two other applicants of other races/national origins." (*Id.*)

   Not quite. Paul alleges that his non-U.S. origins and imperfect English-language skills set him apart from J.R., who (Paul believes) was born in the United States. (Def. Facts ¶ 41; Paul Dep. 76–77) DHS's additional comparators have not been proven to be similar to Paul in those particular, relevant respects. The record identifies them by sex and race, which is suggestive, but contains no specific information about their countries of origin or proficiency in English.

   Still, Paul's speculation that his non-U.S. origin or imperfect English motivated DHS's pay decisions is insufficient to create a genuine issue of material fact at this, the summary judgment stage. Paul's national origin discrimination claim is not specific to his Indian origin; rather, he asserts the more general theory that he was discriminated against because he was "born and raised in a different country." Paul speculates that, reflective of their different national origins, J.R. "spoke English perfectly, did not have a need for a translator, [and that this] might have been the reason" Paul was hired at a lower pay grade.[22] (Def. Facts ¶ 42; Paul Dep. 85:15–17)[23]

---

[21]   M.N. qualified for GS-6, and T.D. qualified for GS-7. I do not discuss A.Z., who was assigned to level GS-5 from the start. (*See* Elia Decl. Ex. B, ECF no. 68-26)

[22]   I note that prior to, and now in addition to, asserting that J.R.'s higher GS grade resulted from national origin discrimination, Paul attributed the disparity to nepotism:

> While I was at work, I heard shocking news about hiring another employee with higher grade. One of the employees (DRA) in the same detained unit was initially hired as Grade 07 and that employee's close relative is a supervisor in the same building with DHS / ICE.

(Paul's Oct. 29, 2010 Letter to Tsoukaris, AC Ex. p. 3) (*see also* Paul Dep. 76:6–11) ("[T]he father of [J.R.] worked in the same building, in the same department as a

At his deposition, Paul could not recall whether any question in his DHS application asked for his national origin (*id.* at 83:17–21), or whether he told anyone or was asked about his national origin before he was hired. (*Id.* at 74:20–25, 75:1)[24] Paul also could not connect his claim of national origin discrimination to the relevant decision makers at the time of hiring. He could not recall whether he met Elia prior to his being hired by DHS, and he had no recollection of ever having met or communicated with the key decision maker, Tougas. (*Id.* at 75:2–14) It was Tougas who, prior to hiring and without ever having met Paul, made the well-documented decision that Paul and two other co-applicants would have to be reclassified as GS-5 in order to accommodate the hiring of another person, E.G.

In sum, Paul points to no substantial evidence of discrimination, other than the bare fact that J.R., who he believes was American-born, was hired at the GS-7 level a year before. I do not believe that a reasonable jury could conclude that DHS's decision to offer Paul a GS-5 starting grade was made

---

supervisor. The reason she was hired in a higher grade was because of her relationship with her father who was a supervisor.")

Paul connects his allegations of nepotism and national discrimination, explaining that in contrast to J.R., Paul "was born and raised in a different country":

> I have no one to ask for me, or speak for me. Therefore, if they—if I am lower—therefore, since I was from a different country, they assumed that it would be okay to give me a lower grade.

(Paul Dep. 77:8–12; Def. Facts ¶ 43)

23    In his deposition, Paul testified with the aid of an interpreter of Malayalam, a language spoken in southern India. Paul refers to a "translator," but he performed his DHS job duties in English, and did not use a translator while working there. (Paul Dep. 85:18–21) Paul testified that he interviewed inmates and prepared paperwork in English while working in the sheriff's department in Georgia. (Paul Dep. 24, 27)

24    Paul testified further to what he hypothetically would have done "if somebody had asked me where I was from, I would have told them I'm from India, or if there was a question on my application requiring me to identify whether I was Indian or Asian, I would have written that down." (Paul Dep. 83:13–16) DHS has met its threshold burden, however, of pointing to a lack of evidence that anyone involved in Paul's hiring knew of his national origin. Thus Paul "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986).

21

under circumstances giving rise to an inference of national origin discrimination. However, even if I were to give Paul the benefit of any doubt and continue to *McDonnell Douglas* steps two and three, I would find that he is unable to rebut DHS's articulated legitimate basis for its actions. I turn to those issues now.

### b. Pretext and DHS's Articulated Legitimate Basis

DHS explains that Paul was qualified for the GS-7 level, but—before offering him the position—DHS lowered the GS levels for Paul and two other selected applicants. DHS explains and documents that it had a non-discriminatory reason for that action. (Def. Mot. 25–27) An internal DHS e-mail exchange in 2008, contemporaneous with DHS's decision to offer Paul the DRA position at the GS-5 grade level, demonstrates that Director Weber "exercised his discretion" to hire Paul—as well as two others, M.N., and T.D.—at the GS-5 level, rather than at the higher levels for which they qualified. He did this because Tougas advised him, in writing, that this would be necessary in order to permit the hiring of E.G., already an intern in the Newark Field Office, who only qualified for GS-5. (Def. Facts ¶¶ 19–26) DHS has articulated a nondiscriminatory reason, supported by contemporaneous evidence, for its decision to hire Paul at the GS-5 level despite his qualification for the GS-7 level in 2008. And there is no evidence that there was any similar need to accommodate another hiree, like E.G., at the time J.R. was hired at the GS-7 level in 2007.

Paul fails to present evidence that the defendant's stated reason is merely a pretext for discrimination. He offers no evidence that discrimination was a motivating or determinative factor in the disparity between his and J.R.'s starting GS grade levels. He offers no direct evidence that the decision makers even knew of his national origin, let alone acted upon it. Nor does he submit any evidence of comments, practices, emails, or the like, showing that management had an ethnic bias.

22

Paul's indirect method of proof—his attempt to discredit DHS's proffered nondiscriminatory reasons—is unavailing. Paul observes that DHS "failed [to] provide the '*guidance*' from Ms. Tougas that" Paul, M.N., and T.D. "must be hired as grade 5 only." (Pl. Opp. 8–9) (emphasis in original) I also understand him to argue that DHS's explanation is not credible because, if it were true, the DRA vacancy announcement would not have described the position as eligible for GS-7 in the first place.[25] (*Id.* 8–10) Related is his argument that he had been clearly told "that the Field Office Director [Weber] has the authority to select the pay grade and he selected the guide lines of the Job Application," rather than being bound by Ms. Tougas's guidance. (*Id.* 9–10)

First, contrary to Paul's argument, DHS has indeed provided a copy of the guidance Tougas sent to Elia in an e-mail on Thursday, May 29, 2008. (*See* Elia Decl. Ex. B, ECF no. 68-26)

Second, given DHS's evidence that it lowered the pay grade of Paul (and two others) to accommodate the hiring of E.G., Paul would be required to offer more than a bare denial. On summary judgment, evidence is required to negate evidence. It is true that DHS has not identified the law, policy, or regulation behind Tougas's belief that the GS downgrade of Paul and two other applicants was required to permit the hiring of E.G. But fundamentally, it is not relevant whether DHS was correct, or could have developed an alternative plan to preserve the GS-7 option: "[I]n a Title VII case, . . . a plaintiff cannot discredit

---

[25]    Paul states the argument thus:

Since the Job announcement is grade 5/7, the Plaintiff qualified for all grades equally and the job announcement consisted of all job criteria, which includes the educational qualifications of the candidates. If the defense was stick with the guidelines to lower the grades, then the purpose of job announcement in higher grades not required. Also Ms. Crellin stated that the job selection (Plaintiffs Exhibit Pl Page 04) was made from the field office, which is not corroborating with the guidelines to lower the grade.

(Pl. Opp. 8)

an employer's proffered legitimate, nondiscriminatory reason for termination by 'simply show[ing] that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 154 n.9 (3d Cir. 2017) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)). Rather, a plaintiff must "produce sufficient evidence to permit a reasonable factfinder to infer that the employer did not actually act for the asserted non-discriminatory reason." *Id.*

That Paul has not done. Assuming *arguendo* that Paul has suggested that DHS's decision was arbitrary, or even nepotistic, he has not shown that it was so implausible or contradictory that discrimination must have been the real basis for it. Accordingly, I will grant summary judgment in favor of DHS on Paul's Title VII claim for wage discrimination based on his national origin.

### B. ADA and Rehabilitation Act

Paul asserts claims under both the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.* Paul's ADA claim fails because federal agencies like DHS are exempted from liability by the ADA itself, which expressly states that the United States is not a covered employer. 42 U.S.C. § 12111(5)(B)(i). However, federal employees like Paul may seek a remedy for disability discrimination under the Rehabilitation Act, 29 U.S.C. § 794. I analyze his claim on that basis.

Under step one of the familiar *McDonnell Douglas* burden-shifting framework, "a plaintiff seeking recovery pursuant to the [Rehabilitation Act] must establish a *prima facie* case of discrimination by demonstrating that (1) he is disabled within the meaning of the [Rehabilitation Act]; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment [action] as a result of discrimination." *Wilkie v. Luzerne Cty.*, No. 3:14CV462, ___ F. Supp. 3d ___, 2016 WL 4803762, at *3

(M.D. Pa. Sept. 14, 2016) (citing *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996)).

Here, the third element of the prima facie case—requiring an "adverse employment action"—is sufficient to dispose of the case. "An 'adverse employment action' is an action that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 257 (3d Cir. 2014) (citing *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir. 1997)).

Paul alleges that he was "unduly watched or monitored or stalked even at [his] break time by [his] immediate supervisor SDDO Martinez" while at work during November 2011.[26] (AC ¶ 6) However, such actions, even if proven, do not amount to an "adverse employment action." *See, e.g.*, *DeLuzio v. Family Guidance Ctr. of Warren Cty.*, No. CIV.A.06-6220FLW, 2010 WL 1379766, at *14 (D.N.J. Mar. 30, 2010) ("complaints of 'micromanaging,' 'increased scrutiny,' and 'reprimands about plaintiff's lateness,' would not rise to the level of materially adverse actions"); *McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 428 (D.N.J. 2009) ("courts have consistently found that an employee's perception that he has been micro-managed, criticized, or scrutinized by his

---

[26]   The alleged watching/monitoring/stalking occurred between November 7–28, 2011. Paul alleges that he first became aware of the alleged discrimination on January 12, 2012. (Pl. Opp. 16) Although Paul does complain that—given his disability—Martinez should not have assigned him an arduous photocopying task on November 28, 2011 (*see* Def. Facts ¶ 69), I do not interpret this as a failure to accommodate claim. If so, Paul could not allege, as he does, that he first became aware of discrimination upon learning of Martinez's report.

Paul points to a log primarily recording accommodations that Martinez made for Paul between November 7 and December 5, 2011. (Pl. Opp. Ex. A3, ECF no. 73-3 pp. 19 – 21) Paul argues that this log "clearly reveals the conspiracy of recording the entire discriminative issues and Plaintiff reasonably believes no further explanation necessary to prove discrimination." (Pl. Opp. 15) I disagree. No reasonable jury could find a prima facie case of disability discrimination based on the fact that Martinez made a written record of this kind.

supervisor fails to rise to the level of" even the lower standard of "*material adversity*" applied to retaliation claims); *Lester v. Natsios*, 290 F. Supp. 2d 11, 30 (D.D.C. 2003) ("in any event, being closely supervised or 'watched' does not constitute an adverse employment action that can support a claim under Title VII") (collecting cases).

Accordingly, Paul cannot establish a prima facie case of disability discrimination under the Rehabilitation Act.[27]

### C. Equal Pay Act

The Equal Pay Act of 1963 ("EPA") generally prohibits wage discrimination on the basis of sex. 29 U.S.C. § 206(d)(1). In a section of the Complaint titled "Rule of Law," Paul lists and describes the EPA, without elaboration. (AC 2 ¶ B) He states in his opposition brief that J.R. is a woman and he is a man, and that J.R. was hired at a higher pay grade. (Pl. Opp. 2–3) DHS responds that Paul never alleged that the disparity between his and J.R.'s wages was due to sex discrimination. (Def. Mot. 33–34) I agree that Paul has not clearly alleged, let alone provided evidence, that his sex played any role in his salary grade assignment. It is insufficient merely to describe an employment action and identify the participants by sex.[28]

No reasonable jury could find that Paul suffered wage discrimination based on his sex. Accordingly, I will grant summary judgment in favor of DHS on Paul's Equal Pay Act claim.

---

[27]   Although Paul's prima facie case is clearly inadequate, I nevertheless note in the alternative that Paul is unable to discredit DHS's legitimate, nondiscriminatory explanation for Martinez's report. DHS explains, and Paul admits, that Martinez only wrote the report at Davis's request, in order to support Paul's application for workers' compensation benefits. (*See* Pl. Opp. 13)

[28]   As it happens, T.D., one of the other persons downgraded to GS-5 along with Paul, is female. (*See* Def. Facts ¶¶ 19–26)

**IV.   Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED as to all counts. An appropriate order follows.

Dated: March 17, 2017

_____

**HON. KEVIN MCNULTY, U.S.D.J.**